UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRUSTEES OF PLASTERS LOCAL 67
PENSION TRUST FUND, TRUSTEES OF
PLASTERS APPRENTICESHIP TRUST                    Case Number 11-11602
FUND, and TRUSTEES OF MICHIGAN                   Honorable David M. Lawson
TROWEL TRADES HEALTH & WELFARE
FUND,

                Plaintiffs,

v.

MARTIN MCMAHON PLASTERING, INC.,

                Defendant.

_____/

## OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DISMISSING COMPLAINT

The plaintiffs in this case are trustees of multi-employer pension plans that have brought suit against a putative employer to collect unpaid fringe benefit contributions. The issue raised in the cross motions for summary judgment now before the Court is whether the defendant, who never signed a collective bargaining agreement or participation agreement with any union, can be held responsible under section 515 of the Employee Retirement and Income Security Act of 1974 (ERISA), 29 U.S.C. § 1145, for fringe benefit payments based on the apparent authority of office personnel, custom and practice, or ratification. Based on the present record, the Court concludes that the answer must be "No." Therefore, the Court will deny the plaintiffs' motion for summary judgment, grant the defendant's motion for summary judgment, and dismiss the complaint.

I.

The plaintiffs are the Trustees of the Plasterers Local 67 Pension Trust Fund, the Plasterers Apprenticeship Trust Fund, and the Michigan Trowel Trades Health & Welfare Fund (collectively, Funds), which were established through collective bargaining and are maintained and administered under section 302 of the Labor-Management Relations Act of 1947, as amended (LMRA), 29 U.S.C. §186, *et seq.*, and ERISA, 29 U.S.C. §1001, *et seq.* The Funds collect and administer fringe benefit contributions made by employers who are bound by labor contracts.

Martin McMahon has worked in construction since he was 15 years old, and he became a plasterer in 1976. He emigrated to the United States from Ireland in 1985 and began working as a plasterer for a number of different employers. He joined Local 67 of the Operative Plasterers' and Cement Masons' International Union in May 1988. While he was employed by those various employers, the employers made contributions on his behalf for pension and health insurance benefits through the Local 67.

Martin decided to start his own business, and in March 1995, he formed Martin McMahon Plastering Company (MMP) and registered it as a Michigan for-profit corporation, which he operated out of the family home. Martin held a 51% ownership stake and was its president. His then-wife, Leslie McMahon (now known as Leslie Allen), held a 49% ownership stake in the company from March 1995 until December 2001. Leslie served as MMP's treasurer and secretary from February 1999 to March 2001. Leslie was replaced by her husband as MMP's treasurer in April 2001, but continued to serve as secretary. Martin and Leslie divorced on February 27, 2002.

-2-

Neither Martin nor Leslie had any background in business when they formed the company. During the early years, Leslie performed office tasks such as preparing invoices, completing tax withholding forms, and opening mail, and Martin was responsible for writing and signing checks, obtaining jobs, and performing the plastering work. Although Martin stated that Leslie was authorized to complete forms on behalf of MMP from March 1995 until December 2002, he also stated that he was MMP's only agent from March 1995 until December 2002. The plaintiffs have offered no contrary evidence. Martin has averred that he never authorized Leslie McMahon to sign his name and never authorized her to sign contracts on behalf of himself or MMP. Once again, the plaintiffs have offered no direct evidence to contradict that assertion.

Martin testified that he was interested in continuing the benefits that he had when he was working as a plasterer for other employers. He contacted Dan McInerney, one of his former employers, and asked about how to obtain those benefits, and McInerney told him to contact the fringe benefit funds' administrative office. Martin believes that he called the fringe benefits office and that he received a package with three or four forms in it after making the phone call. Martin testified that he had health insurance and pension benefits through the Union because he was paying dues for himself. On November 16, 1995, Martin signed the Local 67 Pension Trust Fund form entitled "Enrollment, Investment Election and Beneficiary Designation." The form named Leslie as the sole beneficiary.

MMP made regular contributions for fringe benefits on behalf of Martin McMahon for all the plastering work he did since May 1999 through February 2009. The contributions were allocated to the Pension Fund, the Health and Welfare Fund, the Apprenticeship Fund, and the International Pension Fund. Martin signed the checks himself, but he insists that he believed that he was

-3-

maintaining his benefits by paying dues and fringe benefits solely for himself and not as an employer on behalf of anyone else. In fact, no contributions were made on behalf of anyone but Martin, which does not prove much either way, since MMP never employed anyone else during that period who performed covered work, except in the final period when the dispute arise over MMP's obligation to contribute under the Master Agreements.

The plaintiffs contend that MMP is liable for fringe benefits because it has on file a letter agreement that bound the company to the terms of a contract between the plasters' trade association and the union. The master labor contract at issue in this case is the Plasterers' Agreement between the Architectural Contractors Trade Association (the Employer Association) and Local 67 of The Operative Plasterers' and Cement Masons International Association in the Detroit Area, originally signed in 1997 and renewed every three years through 2009. Article II of the Master Agreements obligates covered employers to make fringe benefit contributions. The plaintiffs rely on an agreement entitled "Agreement for Non-Association Members" (Letter Agreement), which states that any employer who signs it is bound by all provisions contained in the Master Agreement, including its fringe benefit provisions.

The record in this case establishes that at some point after MMP was formed, Leslie McMahon obtained the Letter Agreement form and filled it out in her own handwriting. The key language in the Letter Agreement states:

> This is to certify that I have read the Agreement between the Detroit Association of Wall and Ceiling Contractors and Plasterers' Local Union No. 67 and I agree to be bound by all provisions contained in this Agreement and any changes that may be made in the future by mutual consent of said parties for the life of this Agreement and any successor agreements negotiated by them.
>
> I hereby specifically submit to the jurisdiction of the joint Negotiating Committee and further agree that, with regard to the provisions of the Agreement relating to the

-4-

settlement of grievances, the Association Representatives shall be deemed my
Representative.

Def.'s Mot. for Summ. J., Ex. 6.  Leslie completed the form on December 26, 1997 with the

following information:

> Dated: *December 26, 1997*
> EMPLOYER: *Martin McMahon Plastering Inc.*
> By: *Martin P. McMahon*
> Its: *President*
> Address: *2238 Lyonia, Wixom Michigan 48393*
> Phone: *(248) 624-4411*
> M.E.S.C. No. *Not received yet*
> Workers Compensation Carrier: *Liberty Mutual*
> Policy No. *WCI-345-307359-017.*

*Ibid.*  The Letter Agreement bears only one signature, that of Charles Novak, Local 67's business

agent.  Neither Leslie nor Martin McMahon signed the Letter Agreement, and Martin testified that

he never saw the Letter Agreement until the present litigation was initiated.

Charles Novak testified that he delivered the Letter Agreement to Martin and Leslie

McMahon during a meeting at a restaurant in Wixom, Michigan in December 1997.  Novak said that

he explained the contents of the Letter Agreement to Leslie because Martin was not paying attention.

Novak got the impression that Martin would be doing all the plastering and Leslie would be

performing the office work.  But as far as legal authority to act for the company was concerned,

Novak "didn't think [Leslie] had any position" with the company.  Def.'s Mot. for Summ. J., Ex.

4, Charles Novak dep. at 69.

Nevertheless, MMP continued to send in contributions for Martin's work and used the

benefit report forms furnished by Local 67.  For instance, in February 1998, Leslie McMahon

submitted a fringe benefit contribution report for the work month of January 1998 that listed Martin

McMahon as MMP's only plasterer employee.  The report also contained the following statement:

-5-

> I hereby certify that this is a true report of all hours paid during the report month, in accordance with the obligations assumed by this firm under the current applicable collective bargaining agreement and the provisions of the applicable trust agreements. I further certify that this report does not include contributions on behalf of any self-employed individuals or any employee not covered by the collective bargaining agreement.

Pls.' Mot. for Summ. J., Ex. I. Martin McMahon signed a contribution form containing the same certification clause for the work month of March 2001. Subsequent contribution forms were signed on behalf of MMP by Sue Maynard, whom Martin hired as a secretary in late 2001 when he and Leslie were divorcing.

Sue Maynard's duties for MMP included preparing and submitting various tax forms, including W-2 wage and tax statements, W-3 forms, and 1099-MISC forms. She had access to MMP's bank records. However, Martin McMahon testified that he was the only person that opened mail for MMP after Leslie McMahon left the company. He did not recall receiving the January 22, 2003 letter from the Funds' Payroll Auditing Services that informed him that his January 2001 to December 2002 contributions to the Fringe Benefit Fund had been audited and found to be properly made.

MMP has cooperated with several audits of its fringe benefits contributions. MMP's records were audited by Stefansky, Holloway & Nichols, Inc., the Funds' auditing firm, for the period of January 1998 through December 1999, and periodically thereafter for periods through March 2006. MMP cooperated with the auditors. The audits always revealed that no fringe benefit contributions were due.

However, the audit for the period beginning April 2006 revealed that MMP owed $47,932.37 in overdue fringe benefit contributions for the period from April 1, 2006 to May 20, 2009 and $4,793.24 in liquidated damages, totaling $52,725.61. For the first time, covered workers in

addition to Martin McMahon were included.  Martin did not receive the results of the audit until

March 24, 2011.  That is when Martin protested his obligation to pay fringe benefit contributions

on behalf of other workers, contending that he never agreed to do so.

In March 2009, after deciding that he no longer wished to receive health and pension benefits

through the Union, Martin McMahon directed Sue Maynard to notify Local 67 that he no longer

wanted to receive benefits.  He did not review Maynard's letter before it was sent.  *Id.* ¶ 16.  The

letter states:

> We hereby wish to give notice of our withdrawal from membership in the Plasterer's
> Local Union 67 of the Operative Plasterers' and Cement Masons International
> Association in the Detroit Area.
>
> We ask that you forward any information regarding continuance of the group health
> insurance plan under COBRA regulations to the address of record for our company.

Def.'s Mot. for Summ. J., Ex. 14, March 20, 2009 Termination letter.

On April 14, 2011, the plaintiffs commenced the present action to obtain a judgment for the

audited indebtedness incurred by Martin McMahon Plastering for the period of April 2006 through

June 2009, an order directing defendant to cooperate with an audit for the period of June 2009

through the present, and judgment for money damages owing under ERISA and the plaintiffs' plan

documents.  The Court bifurcated the proceedings and directed the parties to address the liability

question first.  They completed their discovery on that issue and filed cross motions for summary

judgment.  The Court heard oral argument on the motions on February 16, 2012.

II.

-7-

The standards for evaluating a motion for summary judgment are well known but bear repeating here. As the Sixth Circuit recently explained:

> Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits." Fed. R. Civ. P. 56(a), (b). Such a motion presumes the absence of a genuine issue of material fact for trial. The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). Once that occurs, the party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009). In addition, when "'reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party. Thus, the facts and any inferences that can be drawn from those facts[] must be viewed in the light most favorable to the non-moving party.'" *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citations omitted) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)); *see also Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) ("In evaluating the evidence, [the district court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'") (quoting *PDV Midwest Refining, LLC v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002)).

The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329

F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate.").  Instead, the Court must apply the well-recognized summary judgment standards when deciding such cross motions: when this Court considers cross motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

The defendant's main argument is that the Labor-Management Relations Act requires a written agreement to which an employer has assented in order for an employer to be bound to make fringe benefit contributions on behalf of its employees.  That much is certainly true.  Under section 302(c)(5)(B) of the LMRA, an employer's obligation to contribute to a multi-employer trust fund is unenforceable unless "the detailed basis on which such payments are to be made is specified in a written agreement." 29 U.S.C. § 186(c)(5)(B); *Merrimen v Paul F. Rost Elec., Inc.*, 861 F.2d 135, 137 (6th Cir. 1988).  Moreover, ERISA section 515, upon which the plaintiffs' claim for enforcement of contribution obligations is based, states:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.  As the Sixth Circuit has explained, that obligation is non-existent unless the obligation to contribute is specified in a written agreement.  *Nat'l Leadburners Health & Welfare Fund v. O.G. Kelley & Co.*, 129 F.3d 372, 374 (6th Cir. 1997).  The court explained:

> Section 302(a) of the LMRA prohibits employers from making payments to representatives of employees unless the payments fall within one of the statutory exceptions.  29 U.S.C. § 186(a).  One exception allows an employer to make

-9-

> contributions to a trust fund established for the benefit of employees if the obligation to contribute is specified in a written agreement. *Merrimen v. Paul F. Rost Elec., Inc.*, 861 F.2d 135, 137 (6th Cir. 1988). Under § 302(c)(5)(B) of the LMRA, an employer's contributions to a multi-employer trust fund are unenforceable unless "the detailed basis on which such payments are to be made is specified in a written agreement with the employer." 29 U.S.C. § 186(c)(5)(B).

*O.G. Kelley & Co.*, 129 F.3d at 374.

The plaintiffs counter that the labor agreement with the trade association plus the Letter Agreement combine to satisfy the requirement of a writing. They point to language in *O.G. Kelley & Co.* that confirms that the LMRA's written agreement requirement is satisfied "by a written agreement to which an employer is bound, not a written agreement to which an employer is bound which also carries that employer's signature." *Id.* at 376.

The plaintiffs acknowledge that Martin McMahon never signed the Letter Agreement on behalf of MMP. But the plaintiffs contend that the agreement is enforceable and MMP is bound by it nonetheless because (1) Leslie McMahon had actual authority to bind MMP; (2) she had apparent authority to do so; (3) the course of dealing established MMP's intent to be bound by the Letter Agreement; and (4) MMP, by its conduct, ratified the Letter Agreement after the fact and should be bound by the requirement to make fringe benefit contributions. The Court considers each of these arguments in turn.

### A.  Actual authority

The LRMA anticipates that unions and employers will act through their respective agents. Section 301 states that "[a]ny labor organization which represents employees in an industry affecting commerce . . . and any employer whose activities affect commerce . . . shall be bound by the acts of its agents." 29 U.S.C. § 185(b). However, another provision in that same section states that "in

determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. § 185(e).  In *Central States Southeast and Southwest Areas Pension Fund v. Kraftco, Inc.*, 799 F.2d 1098 (6th Cir. 1986) (en banc), the Sixth Circuit explained that "[t]hese provisions have been construed as adopting common law standards of agency." *Id.* at 1112 (citing *Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 217 (1979)).  Nonetheless, "[w]ith respect to agency and apparent authority, [the Sixth Circuit has] held that common law principles are not to be applied rigidly." *Ibid.*

The defendant argues that Martin McMahon never authorized Leslie McMahon to sign his name and never authorized her to sign contracts on behalf of himself or MMP.  The plaintiffs argue that Martin's statements about the direction and authority given to Leslie more than a decade after the Letter Agreement was completed are self-serving and contradictory and should be given little weight in determining whether MMP intended to be bound by the CBA.  The plaintiffs also point to the fact of Leslie's co-ownership and her position as corporate treasurer and secretary as evidence of her authority to fill out and bind the company to the Letter Agreement.

It is true that the nature and scope of an agent's authority generally are questions of fact. *Kraftco*, 799 F.2d at 1112-13.  However, like all fact questions, summary judgment is appropriate when the party opposing the motion has not come forth with evidence to create a genuine dispute. *Street*, 886 F.2d at1479.  The plaintiffs here have offered no evidence that Martin authorized Leslie to bind MMP to a union contract.  And the plaintiffs have offered no authority for the proposition that a minority shareholder, a corporate secretary, or treasurer has the authority to contractually bind a corporation by virtue of those positions alone.  In fact, Michigan law appears to be to the contrary.

-11-

*See In re Union City Milk Co.*, 329 Mich. 506, 512, 46 N.W.2d 361, 364 (1951) (holding that general manager of a corporation did not have authority to bind the corporation to a guaranty); *McBroom v. Cheboygan Brewing & Malting Co.*, 162 Mich. 323, 329,127 N.W. 361, 363 (1910) (holding that the secretary of a brewery corporation had no authority by virtue of his office to bind corporation as guarantor for payment of rent).

The Court finds, therefore, that the uncontradicted evidence compels the conclusion that Leslie McMahon did not have the actual authority to bind the defendant to the Letter Agreement (which she never signed in any event) or otherwise oblige it to make fringe benefit contributions.

### B.  Apparent authority

The plaintiffs next argue that Leslie McMahon had the apparent authority to enter into the Letter Agreement on behalf of MMP.  They contend that it was reasonable for Local 67's business manager, Charles Novak, in light of his experience in dealing with family businesses, to infer that Leslie had authority to bind MMP because she was the wife of Martin McMahon and accompanied him to the restaurant meeting with the union representative; she completed forms for the company; and she remitted contribution reports on behalf of the company.  Once again, the law does not favor the plaintiffs' position.

In *Kraftco*, the court explained:

> Apparent authority cannot be established merely by showing that the agent claimed authority or purported to exercise it, but must be established by proof of something said or done by the principal on which a third person reasonably relied.  The burden of proving apparent authority rests on the party asserting that the act was authorized.
>
> . . . Apparent authority can, therefore, be created only by the principal's manifestations to a third party. . . . The agent's representations of authority to a third person, standing alone, are insufficient to create apparent authority in the agent to act for the principal.

-12-

*Kraftco*, 799 F.2d at 1113 (quoting *Moreau v. James River-Otis, Inc.*, 767 F.2d 6, 9-10 (1st Cir.

1985) (footnotes omitted)).  The court elaborated on that rule in *Anderson v. International Union,*

*United Plant Guard Workers of America*, 150 F.3d 590 (6th Cir. 1998), reiterating that "[u]nder the

federal common law of agency, apparent authority arises in those situations where the principal

causes persons with whom the agent deals reasonably to believe that the agent has authority."  *Id.*

at 593 (citing *Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982 (3d Cir. 1995)).  The court then

articulated the following test:

> It is well-settled that apparent authority (1) results from a manifestation by a person
> that another is his agent, regardless of whether an actual agency relationship has been
> formed and (2) exists only to the extent that it is reasonable for the third person
> dealing with the agent to believe that the agent is authorized.

*Ibid.* (citing  Restatement (Second) of Agency §§ 8, 27 & cmts.).

In *Trustees of the Ohio Bricklayers Pension Fund v. Skillcraft Systems of Toledo, Inc.*, 99

F. App'x 600 (6th Cir. 2004), the court applied that test in a case factually similar to the one

presently before the Court.  In that case, Gail Mitchell worked as a secretary, bookkeeper, and office

manager for Skillcraft.  She filled out a form that was quite similar to the Letter Agreement in the

present case.  When Mitchell returned the form, she wrote in "the names of Skillcraft's president and

vice president on the line labeled 'authorized representative and title' [ ]and returned the union copy

of the form to . . . the union's business manager.  Despite the lack of a signature line for Skillcraft's

'authorized representative,' or anything purporting to be an actual signature, [the business manager]

nevertheless assumed that [the union] had a binding contract with Skillcraft."  *Id.* at 601.  The

trustees sued to collect unpaid fringe benefits, and the district court granted summary judgment to

the defendant because Mitchell did not have apparent authority to bind Skillcraft.  The court of

appeals affirmed, approving the district court's finding that "Skillcraft had not explicitly or

-13-

implicitly manifested that Mitchell was its agent for executing a binding [CBA] . . . [and] there was nothing in the record to establish that the plaintiffs could have believed the agent was authorized to sign the document at issue." *Id.* 601-02. The court of appeals also rejected the argument that Mitchell could bind the company where the form was filled out and returned as requested in the normal course of business, because "such a rule — taken to its logical extreme — would allow any employee, even a mail room clerk or an intern, to bind a company to a contract." *Id.* at 602.

In the present matter, Charles Novak testified that he did not rely in any way on Leslie McMahon's apparent authority to bind MMP to the labor agreement. First, Novak knew that Martin did not complete the Letter Agreement. The parties have agreed, for the purpose of these motions, that Leslie filled out the Letter Agreement. Second, when Novak met with Martin and Leslie, he did not think that she had any position of authority with MMP, and Martin said nothing to give Novak the impression that Leslie was his agent.

*Skillcraft* suggests that the plaintiffs in this case cannot point to the concept of apparent authority to validate the unsigned Letter Agreement. Charles Novak's testimony negates the possibility that Local 67 relied on Leslie McMahon's conduct to conclude that MMP opted in to the labor agreement between the union local and the trade association.

### C. Course of conduct

The plaintiffs finally argue that the subsequent course of dealing by MMP either manifested an intent to be bound to the Letter Agreement or amounted to ratification of Leslie McMahon's conduct of filling out and returning the Letter Agreement form. They point out that nothing in the LMRA requires that a participating employer actually sign the written agreement to pay fringe benefit contributions, and the agreement to opt in to a written CBA can be inferred by operation of

-14-

law. *O.G. Kelley & Co.*, 129 F.3d at 376. The course of conduct identified by the plaintiffs consists of MMP making voluntary contributions on behalf of Martin McMahon, furnishing fringe benefit contribution reports that contained clauses that certified that the payments were made pursuant to a collective bargaining agreement, and cooperation in the audits.

### 1. Voluntary contributions

The Sixth Circuit has held that where an employer has never assented to a CBA, the employer is not "bound to make pension contributions in accordance therewith merely because it did so voluntarily for a time." *Merrimen v. Paul F. Rost Electric, Inc.*, 861 F.2d 135, 139 (6th Cir. 1988); *see also O.G. Kelley & Co.*, 129 F.3d at 374-75 ("In *Merrimen*, this court held that an employer's assent to be bound by the pension provisions of a [CBA] could not be inferred from conduct alone where the employer indisputably did not adopt or promise to adopt the agreement in any form of writing and where the [CBA] required a signature in order to bind an employer."); *Michigan Bricklayers & Allied Craftsmen Health Care Fund v. Northwestern Constr., Inc.*, 116 F.3d 1480, at *2 (6th Cir. 1997) (table) ("An employer's intent to be bound by the benefits fund provisions of a collective bargaining agreement cannot be inferred when the employer has not signed a collective bargaining agreement."). As noted above, MMP did not sign the Letter Agreement, and it did not otherwise assent in writing to be bound by the Master Agreements.

The Master Agreements by their own terms are between the union local and the Employer Association, which can act "as the Bargaining Agent for and on behalf of its members and all independent employers who are or become members." The Master Agreements further provide that "the [Employer] Association is acting only as an agent in the negotiation of this agreement and is the agent only for those employers, individuals, partnerships and corporations who have authorized

it to do so." *See* Def.'s Mot. for Summ. J., Ex. 1, Master Agreement from 1997-2000 at 1. MMP is not and never was a member of the Employer Association.

The plaintiffs have called the Court's attention to cases in which voluntary contributions were found to support a conclusion that an employer was bound to labor agreements that mandated fringe benefit contributions. However, in those cases, other factors contributed to the ultimate findings. For instance, in *Central States, Southeast and Southwest Areas Pension Fund v. Behnke, Inc.*, 883 F.2d 454 (6th Cir. 1989), the employer made voluntary fringe benefit contributions after the CBA expired. But in that case, the employer signed a participation agreement that incorporated an earlier Trust Agreement, which in turn provided that the employer would continue to make contributions while a renewed CBA was being negotiated. *Id.* at 461. The Sixth Circuit made that very point in *Central States, Southeast & Southwest Areas Pension Fund v. General Materials, Inc.*, 535 F.3d 506 (6th Cir. 2008), when it explained that *Behnke* does not stand for the proposition that an employer may be bound by an expired CBA solely on the basis of its conduct. The court held in that case that an employer's continuing contributions to a fringe benefit plan after the CBA expired did *not* amount to an adoption of the Participation Agreement or an acknowledgment of an obligation to be contractually bound. *General Materials*, 535 F.3d at 509; *see also Teamsters for Michigan Conference of Teamsters Welfare Fund v. Blue Sky Heavy Hauling, Inc.*, No. 09-10837, 2010 WL 522786, at *6 (E.D. Mich. Feb. 8, 2010) (Edmunds, J.) ("The *Behnke* court found that the interim agreement served as an independent contractual basis to hold the defendant liable.").

The plaintiffs also cite *Gariup v. Birchler Ceiling & Interior Company*, 777 F.2d 370 (7th Cir. 1985), and *Board of Trustees of the Plumbers Local Union No. 93 U.A. v. Waterworks, Inc.*, 524

-16-

F. Supp. 2d 1081 (N.D. Ill. 2007), to support the position that paying wages and fringe benefit contributions can bind an employer to a CBA. But neither case governs here.

In *Gariup*, the president of the employer signed two "Assent of Participation" forms in 1979 and returned them to the union; he also returned, without signing, the union's "Acceptance of Working Agreement," which included his federal employer identification number. *Gariup*, 777 F.2d at 372. One of the Assent of Participation forms stated: I . . . have read a certain agreement, known as an 'Agreement and Declaration of Trust' entered into by Laborer's Union . . . # 81 . . ." and "[i]t is my . . . desire to participate and become a party in the same manner and form as any other participating employer . . . ." *Id.* at 372 n.2. From May 1979 until January 1981, the employer submitted contribution reports and payments to the pension fund based on the rates listed in the CBA. The employer continued to employ two union members until January 1983. The trial court found that the employer adopted the subsequent CBAs through its course of conduct, but the employer did not challenge that finding on appeal. The court ultimately held that section 302(c)(5)(B) of the LMRA was satisfied because the employer's execution of the Assent of Participation constituted a written agreement that demonstrated the employer's intent to contribute to the union fund.

*Gariup* is distinguishable because the employer's president signed the Assent of Participation form and testified that his "intention was to satisfy the Union, you know, to whatever extent they wanted me to so I could keep peace with them." *Id.* at 374. That key fact was crucial to the Sixth Circuit in *Merrimen*, which discussed *Gariup* and ultimately stated: "[G]iven the clear import of the statute and the tenor of the cases which have interpreted it, this Court declines to hold that an employer which never signed its assent to a CBA is bound to make pension contributions in

-17-

accordance therewith merely because it did so voluntarily for a time." *Merrimen*, 861 F.2d at 139. Of course, the court narrowed *Merrimen*'s holding in *O.B. Kelley*, but the Sixth Circuit has never dispensed with the requirement that an employer assent to be bound by a written agreement to make fringe benefit contributions.

The court in *Board of Trustees of the Plumbers Local Union No. 93 U.A. v. Waterworks, Inc.*, 524 F. Supp. 2d 1081 (N.D. Ill. 2007), simply held that voluntary payment of fringe benefits did not establish an intent to be bound by a CBA, even though such payments under an oral agreement would be illegal under the LMRA. The court found that factual issues precluded summary judgment in that case.

In this case, MMP's contributions cannot unequivocally be referable to its intention to opt in to the Master Agreement. No one with authority from MMP ever agreed in writing to participate, and Martin McMahon has expressed the unrebutted intention to contribute only for his own pension benefits.

### 2. Certification Clauses

The plaintiffs, citing *Trustees of Flint Michigan Laborers' Pension v. In–Puls Construction Co.*, 835 F. Supp. 972 (E.D. Mich. 1993), argue that Martin McMahon's signature on the forms containing the certification clauses show that MMP intended to be bound to the CBA. In *In-Puls*, the president of the employer never signed the CBA but signed payroll reports that indicated he paid his employees the union rate, included references to both unions that plainly referred to contributions to the fringe benefit fund, and deducted $1 per hour from each employee's gross pay pursuant to the CBA to pay into the vacation fund, although those contributions were never paid to the union. *In-Puls*, 835 F. Supp. at 973. The president of the employer also wrote the employer's

-18-

name in two places on the union CBA. The president authorized another employee to sign fringe benefit contribution reports stating that the employer "agrees to the terms of payment as set forth in the current Collective Bargaining Agreement and Trust Agreement." *Ibid.* The court held that *Behnke*, and not *Merrimen*, controlled and that the employer "provided clear evidence of its intent to provide benefits pursuant to the CBA." *Ibid.*

But the persuasive force of *In-Puls* was diminished by the Sixth Circuit in *General Materials*, when it stated that another district court that relied on *Behnke* for the idea that certifications in reporting forms can establish the intent to be bound by a Master Agreement read the *Behnke* decision to broadly. *General Materials*, 535 F.3d at 510. Instead, the *General Materials* court summarized the state of the law in this circuit as follows:

> No Sixth Circuit case law supports the Fund's contention [that the certification clauses established the employer's duty to contribute]. Given the paucity of pertinent Sixth Circuit precedent — as well as the equivocal weight the Seventh Circuit gives certification clauses — we conclude that the Certification Clause did not obligate General to contribute after the 1991 CBA expired.

*Ibid.*

In addition, the language in the reporting forms in this case is far less indicative of an intent to be bound by the Master Agreement than the counterpart in *In-Puls*. Where the *In-Puls* form contained an actual agreement with the CBA's payment terms, the forms in this case stated that data furnished was "a true report of all hours paid during the report month, in accordance with the obligations assumed by this firm under the current applicable collective bargaining agreement . . . ." The certification did not acknowledge that MMP actually had assumed any obligation under the CBA, and it was entirely consistent with Martin McMahon's understanding that he was making contributions on behalf of himself only so that his benefits would continue.

-19-

The Court concludes that the certification statements on the reporting forms do not establish MMP's intent to be bound by the Master Agreement, nor do they show that Martin McMahon intended to adopt or ratify the unsigned Letter Agreement.

### 3. Cooperation with audits

The plaintiffs have not cited any case law that supports the proposition that cooperation with an audit can bind an employer to a CBA. Moreover, all the audits except the final one resulted in a finding of no liability. That evidence does not tell much about either party's intent or understanding.

### D. Ratification

The plaintiffs argue that MMP's course of conduct — a decade of contribution history, compliance with multiple audit requests, and completion of contribution reports with signed certification statements — is sufficient for the Court to find that MMP ratified Leslie McMahon's submission of the Letter Agreement on behalf of MMP. Once again, the Court turns to agency principles to address that argument. *Kraftco, Inc.*, 79 F.2d at 1112.

Under Michigan law, "[f]ailure to repudiate an unauthorized agreement and accepting the benefits of such an agreement can constitute a ratification" as long as the "principal ha[d] knowledge of all material facts." *Capital Dredge and Dock Corp. v. City of Detroit*, 800 F.2d 525, 530 (6th Cir. 1986) (citing *Langel v. Boscaglia*, 330 Mich. 655, 48 N.W.2d 119 (1951); Restatement (Second) of Agency §§ 91, 94, 98 (1958)). Similarly, "[r]atification occurs where the principal receives and retains the benefits of a transaction with full knowledge of all material facts." *Davis v. Mut. Life Ins. Co. of New York*, 6 F.3d 367, 374 (6th Cir. 1993) (applying Ohio law). In order for "ratification of an unauthorized act of an agent to be made binding on a principal[, it] must have been done with a

-20-

full knowledge of all the material facts, and if they have been suppressed or unknown, the ratification is treated as invalid." *Grant Cnty. Deposit Bank v. Greene*, 200 F.2d 835, 838 (6th Cir. 1953) (applying Kentucky law). Ratification by silence may occur "only if the principal failed to repudiate the agent's conduct within a reasonable time after learning of the conduct." *Richards v. General Motors Corp.*, 876 F. Supp. 1492, 1507 (E.D. Mich. 1995) (citing *Capital Dredge*, 800 F.2d at 530).

The record evidence in this case is not sufficient to establish ratification by MMP of any acts of Leslie McMahon or any other employee concerning the Letter Agreement or the Master Agreements. Martin McMahon has testified that he "never entered, or intended to enter, into a labor contract on behalf of MMP" and that he believed that he "could maintain pension and health insurance benefits for [himself], personally and individually, through the Plasterers Local 67 by paying contributions only on [his] behalf and not as part of any requirement under a labor contract." Def.'s Mot. for Summ. J., Ex. 13, Martin McMahon aff. ¶¶ 7, 12. He also testified that he never saw the Letter Agreement until the present litigation was initiated. *Id.*, Ex. 12, Martin McMahon dep. at 34, 42. There is no evidence to the contrary. Martin denies that the restaurant meeting described by Charles Novak ever occurred. The Court must credit Novak's testimony on that point on summary judgment, taking the evidence in the light most favorable to the nonmoving party. But Novak testified that Martin did not pay attention to Novak's explanation of the Letter Agreement to Leslie. Accepting Novak's evidence at face value, there still is no proof that Martin was aware of the Letter Agreement until this lawsuit was underway, so a key component of the plaintiffs' ratification theory fails for lack of evidentiary support.

-21-

Martin McMahon did sign the March 2001 fringe benefit contribution form that included the certification clause. But as noted earlier, that form did not contain language that constituted an agreement to be bound by the Master Agreements or an acknowledgment that MMP actually had opted in to that Agreement.

III.

The Court finds that the record contains no evidence that an authorized representative of Martin McMahon Plastering Company signed an agreement that bound the company to the obligation to pay fringe benefit contributions under the Master Agreements between the Architectural Contractors Trade Association and Local 67 of The Operative Plasterers' and Cement Masons International Association in the Detroit Area. Nor is there sufficient evidence from which a fact finder could conclude that MMP intended to be bound by those agreements. The defendant, therefore, is entitled to judgement in its favor as a matter of law.

Accordingly, it is **ORDERED** that the plaintiffs' motion for summary judgment [dkt. #16] is **DENIED**.

It is further **ORDERED** that the defendant's motion for summary judgment [dkt. #10] is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.


s/David M. Lawson_____
DAVID M. LAWSON
United States District Judge

Dated:   February 21, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 21, 2012.

s/Deborah R. Tofil_____
DEBORAH R. TOFIL